# STATE OF MICHIGAN

# COURT OF APPEALS

In re A. C. HAWKINS, Minor.

UNPUBLISHED
December 29, 2016

No. 332957
Oakland Circuit Court
Family Division
LC No. 2015-830363-NA

Before: GADOLA, P.J., and FORT HOOD and RIORDAN, JJ.

PER CURIAM.

Respondent appeals as of right the trial court order terminating her parental rights to the minor child under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care or custody), and (j) (risk of harm if returned to parent).[1] We affirm.

## I. FACTUAL BACKGROUND

In April 2015, respondent gave birth to the minor child. At the time, respondent had been living in a motel in Royal Oak, Michigan. Shortly after the child's birth, petitioner, the Department of Health and Human Services ("DHHS"), received a complaint concerning respondent's ability to care for the newborn child based on allegations of mental health issues and unstable housing. DHHS subsequently filed a petition alleging that the child qualified under the provisions of MCL 712A.2(b)(1) and (2) for several reasons: (i) respondent had a history of mental illness, including schizophrenia and delusional disorder; (ii) respondent had not followed treatment or medication recommendations with regard to those mental health issues and, instead, believed that she had no mental health issues; (iii) there were concerns concerning respondent's ability to care for the child "on her own due to her untreated mental health"; (iv) consistent with an ongoing pattern of homelessness and unstable housing, respondent was living in a motel that was only paid through the end of the week; and (v) respondent chose homelessness given the amount of monthly assistance that she received in social security benefits and food stamps and

---

[1] Under the order terminating respondent's parental rights, the trial court noted that the putative father had been notified of the child protective proceedings, but "no person ha[d] come forward as a result of the notice to putative father." Accordingly, the court found that the child had no legal father.

her failure to seek assistance from family members. Before the child left the hospital, the trial court entered an ex parte order ordering that the child be taken into protective custody and placed under the care and supervision of DHHS for the reasons stated in the petition. The trial court later authorized the petition for removal after a preliminary hearing. During the hearing, respondent indicated that she was unsure of whether she had any Native American heritage.

A bench trial was held in June 2015. The trial court heard testimony from respondent and Shaquinta Price, a Child Protective Services ("CPS") worker who described her investigation of the allegations in this case as well as her interactions with respondent. At the time of the adjudication, respondent was still living in a motel. She testified that she received approximately $1,500 per month in social security disability payments for physical ailments, including back pain, pain in her lower extremities, and hair loss, as well as food stamps and some child support. She adamantly denied having any mental health problems, explaining that she was falsely diagnosed in 2012 after seeing a doctor for various physical complaints, and every doctor she visited after that was able to see this diagnosis in her electronic medical records. She testified that she had initiated a defamation lawsuit in federal court against the diagnosing doctor based on the allegedly false diagnosis, which had been dismissed.

The trial court found that petitioner had proven by a preponderance of the evidence that the child came within the statutory grounds for jurisdiction based on a lack of proper custody and, "to a lesser extent," an unfit home environment in light of "the testimony of Ms. Price and the circumstances surrounding the birth of the child, mother's own testimony and her admitted psychiatric history, although she disagreed with some of the previous doctors' evaluations." The court also noted the medical documentation presented at trial from respondent's hospital stay during the birth of the minor child, which included Dr. Dunyue Lu's diagnosis of delusional disorder and his opinion that it was "questionable" that respondent would be able to take care of the newborn child by herself.

Between July 2015 and October 2015, respondent moved to a new hotel, where she remained for the rest of the child protective proceedings. Although she consistently attended all scheduled visits with the child, she refused to participate in *any* of the other services recommended under the parent/agency agreement ("PAA"), and ordered by the trial court,[2] even though she acknowledged on multiple occasions that she was jeopardizing her parental rights by refusing to comply. Most notably, respondent declined to participate in court-ordered psychological and psychiatric evaluations even after petitioner and the court explained to respondent that (1) the psychological and psychiatric evaluations would clarify the issues and prove whether respondent had been incorrectly diagnosed, and (2) that her noncompliance would

---

[2] The PAA required, among other things, participating in psychological and psychiatric evaluations; following the recommendations of the clinicians who performed the evaluations; participating and benefitting from individual therapy; signing medical releases for information related to her mental health history and treatment; obtaining and maintaining suitable housing; consenting to a home study; participating in and benefiting from parenting classes; and utilizing budgeting techniques in order to maintain a consistent residence.

most likely result in the termination of her parental rights. In addition, Erin Wearing, an Oakland County foster care manager, expressed concerns regarding respondent's parenting skills and interactions with the minor child, especially respondent's refusal or resistance to follow suggestions and guidance offered by both Wearing and medical professionals regarding the child's development and care. Wearing also testified that respondent's conduct during the visits seemed to have negative emotional and physical effects on the child. Accordingly, in October 2015, the trial court suspended visitation given the concerns regarding respondent's visits with the child and her failure to comply with the PAA, holding that DHHS had the discretion to recommence visitation if respondent began to participate in the ordered services.

The status of the case remained unchanged at the time of the permanency planning hearing in January 2016. By that time, respondent had been offered individual therapy, psychological and psychiatric evaluations, parenting classes, parenting time, case management services, visits to the birth home, budgetary assistance, a family team meeting, and a home visit, but she unequivocally refused to participate in any of the services and failed to cooperate with any of Wearing's efforts. Consistent with the trial court's ruling, petitioner filed a supplemental petition seeking termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j) in February 2016.

A termination hearing was held in March 2016. A few days before the hearing, respondent suddenly gave birth to another child, later testifying that she was not aware that she was pregnant until she gave birth to the child in her hotel room. During the hearing, the trial court heard extensive testimony from respondent, who continued to maintain that she had no past or present mental health issues. Similar to her previous statements on the record, respondent explained that she did not participate in the offered services because they did not apply to her, they would provide nothing in this case given her lack of mental health history, and she had been working with "other entities." Wearing also testified regarding the history of the case, petitioner's concerns about respondent's ability to parent the child, and the child's well-being in her current placement.

At the end of the termination hearing, the court extensively discussed the facts of this case and concluded that clear and convincing evidence supported termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). It also held that a preponderance of the evidence in the record demonstrated that termination of respondent's parental rights was in the child's best interests.

## II. MENTAL HEALTH EXPERT[3]

---

[3] In conjunction with the issues raised on appeal, respondent briefly contests the trial court's initial exercise of jurisdiction in this case on similar grounds. We decline to address these arguments because respondent's challenge to the court's initial adjudication constitutes an impermissible collateral attack. Jurisdiction may be challenged only on a direct appeal of the jurisdictional decision, not through a collateral attack in an appeal of an order terminating

Respondent first contends that the trial court erroneously terminated her parental rights on the basis of her alleged mental illness when no expert witness testimony was presented regarding whether she had a mental illness that prevented her from caring for her child. Respondent fails to establish that she is entitled to relief.

## A. STANDARD OF REVIEW

Because respondent did not raise an issue regarding the lack of expert testimony in the lower court, we review this issue for plain error affecting respondent's substantial rights. *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008).

> Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings. When plain error has occurred, [r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant *or* when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id*. (quotation marks and citations omitted).]

## B. ANALYSIS

As an initial matter, respondent's statement of the issue specifically limits our inquiry to whether expert testimony was required in order for her parental rights to be terminated on the basis of mental illness. She cites no authority on appeal in support of this argument. Thus, we deem the claim abandoned. See *In re ASF*, 311 Mich App 420, 440; 876 NW2d 253 (2015). To the extent that respondent's claim is, in substance, a challenge to the sufficiency of the evidence supporting the trial court's termination of her parental rights, such a claim is also abandoned due to her failure to specifically include it in her statement of the questions presented and failure to cite authority in support of such a claim. See MCR 7.212(C)(5); *In re TK*, 306 Mich App 698, 712; 859 NW2d 208 (2014); *Ypsilanti Fire Marshal v Kircher (On Reconsideration)*, 273 Mich App 496, 543; 730 NW2d 481 (2007), lv gtd in part 480 Mich 910 (2007). Nevertheless, we briefly conclude that respondent's claims have no merit.

In order to terminate parental rights, the trial court must find that a statutory basis for termination under MCL 712A.19b(3) has been established by clear and convincing evidence, *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013), and that termination is in the best interests of the child based on a preponderance of the evidence on the whole record, *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014) (footnotes omitted). We review for clear error a trial court's factual findings and ultimate determinations regarding whether a statutory basis for termination has been established and whether termination is in the best interests of the child. *Id*. at 709.

Most notably, respondent repeatedly refused to comply with the psychological and psychiatric evaluations that were recommended by petitioner and ordered by the trial court in this case, which would have provided concrete evidence—from experts in the mental health field—of

parental rights entered after the filing of a supplemental petition. *In re Hatcher,* 443 Mich 426, 439; 505 NW2d 834 (1993); *In re SLH,* 277 Mich App 662, 668; 747 NW2d 547 (2008).

whether she had a mental illness or mental health issues. Given respondent's refusal to submit to these evaluations, we cannot conclude petitioner's failure to present expert testimony warrants reversal of the order terminating respondent's parental rights. Further, there is no indication that expert testimony was necessary to establish that respondent struggled with mental health issues that affected her ability to care for herself and a child given (1) the hospital records from the birth of the minor child admitted at the initial adjudication and referenced during the termination hearing,[4] which specifically discussed respondent's mental illness and related concerns regarding her ability to care for the newborn; (2) respondent's admission that she was previously diagnosed with schizophrenia and other conditions, even though she contested the validity of the diagnoses; (3) various testimony regarding respondent's paranoia; and, (4) as the trial court recognized, the clear evidence that respondent had delusional tendencies or other mental health problems.

Additionally, in claiming that her alleged mental health issues were "[t]he entire fulcrum" of the case, respondent fails to recognize that her parental rights were terminated on multiple grounds under MCL 712A.19b(3)(c)(*i*), (g), and (j). In particular, the trial court concluded that termination of respondent's rights was proper in light of various issues both related to and separate from her mental health issues—such as her consistent lack of suitable housing, petitioner's ongoing concerns related to her parenting techniques and interactions with the child during visitations, and her failure to heed the suggestions of child care workers or the advice provided by medical professionals concerning the child—which were not resolved during the pendency of the child protective proceedings. Moreover, respondent's failure to comply with any portion of the PAA ordered by the trial court, except for attending scheduled visitation with the child, was evidence that respondent would not be able to provide the child with proper care and custody, and that the child would be harmed if she were returned to respondent's home. *In re White*, 303 Mich App at 710-711. Accordingly, the trial court did not clearly err in concluding that termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j) was supported by clear and convincing evidence.[5]

## III. REASONABLE EFFORTS AND ACCOMMODATIONS

Respondent contends that the trial court erred by failing to recognize that she may have needed specialized services under the Americans with Disabilities Act ("ADA"), 42 USC 12101 *et seq.*, and by finding that DHHS had made reasonable efforts to reunify respondent with her child. We reject respondent's claims.

Reasonable efforts to reunify a parent and child and rectify the conditions that led to the child's removal must be made "in all cases" except those involving aggravated circumstances that were not present here. MCL 712A.18f(1), (2), and (4); MCL 712A.19a(2); *In re Mason*, 486

---

[4] We note that respondent does not contest the admissibility of the medical records on appeal and, in fact, cites the medical records in her brief.

[5] Respondent does not contest the trial court's best-interest determination on appeal. Nevertheless, we note that that trial court properly concluded that termination of respondent's parental rights was in the best interests of the child. See *In re White*, 303 Mich App at 709, 713.

Mich 142, 152; 782 NW2d 747 (2010). See also *In re Hicks/Brown,* ___ Mich App ___, ___; ___ NW2d___ (2016) (Docket No. 328870); slip op at 6. However, respondent is not entitled to challenge the efforts made by DHHS in this appeal.

In *In re Terry,* 240 Mich App 14, 25; 610 NW2d 563 (2000), this Court held that "the ADA does require a public agency such as the Family Independence Agency (FIA) [now DHHS] to make reasonable accommodations for those individuals with disabilities so that all persons may receive the benefits of public programs and services." Thus, "the reunification services and programs provided by the FIA must comply with the ADA." *Id.* However, the Court further noted:

> Any claim that the FIA is violating the ADA must be raised in a timely manner . . . so that any reasonable accommodations can be made. Accordingly, if a parent believes that the FIA is unreasonably refusing to accommodate a disability, the parent should claim a violation of her rights under the ADA, either when a service plan is adopted or soon afterward. The Court may then address the parent's claim under the ADA. Where a disabled person fails to make a timely claim that the services provided are inadequate to her particular needs, she may not argue that petitioner failed to comply with the ADA at a dispositional hearing regarding whether to terminate her parental rights. [*Id.* at 26.]

In light of these principles, this Court concluded in *In re Terry* that the respondent had waived the right to raise an issue regarding the failure to accommodate. *Id.* at 26 n 5. However, in *In re Frey,* 297 Mich App 242; 824 NW2d 569 (2012), this Court determined that the issue was one of preservation, stating that " '[t]he time for asserting the need for accommodation in services is when the court adopts a service plan,' " and noting that the respondents in that case "failed to object or indicate that the services provided to them were somehow inadequate, thereby failing to preserve this issue." See also *In re Hicks/Brown,* ___ Mich App at ___; slip op at 9 (identifying the issue as one of preservation).

This same conclusion results regardless of whether we analyze this issue in terms of whether respondent adequately *preserved* this issue for appeal or *waived* this issue below. Respondent did not challenge the alleged lack of accommodation in the trial court or the services provided by DHHS following the adoption of the PAA. As a result, respondent's challenge is untimely, and she is not entitled to challenge on appeal the services offered by DHHS or the trial court's alleged failure to recognize that she needed specialized accommodations or services.

Even if we analyze this unpreserved claim to determine whether the nature of the services in this case constituted a plain error affecting respondent's substantial rights, respondent has failed to establish that she is entitled to relief. See *In re Utrera*, 281 Mich App at 8-9. The record provides no basis for concluding that the outcome of the proceedings would have been different had DHHS provided additional services or reasonable accommodations. *Id.* Additionally, respondent's conduct, as well as the trial court's and DHHS's efforts to convince respondent to participate in the services in this case, clearly distinguishes the instant case from *In re Hicks/Brown*, ___ Mich App ___.

From the outset of this case, it was clear that respondent has mental health issues. The trial court acknowledged those issues and expressed its belief that "a very limited number of services" would enable respondent to make a "smooth transition into parenthood." As previously discussed, once the court took jurisdiction, respondent was immediately offered—and ordered to participate in—numerous services intended to improve her parenting skills, address her mental health issues, and obtain suitable housing. After the PAA was in place, respondent never indicated that she needed additional services or accommodations. To the contrary, she adamantly denied that she had any mental or psychological conditions or disabilities, emphasizing on multiple occasions that she was falsely diagnosed in the past. Although respondent testified that she received social security disability payments for physical reasons, the record provides no indication that she suffered from any physical disabilities that required accommodation.[6]

Most significantly, there is absolutely no indication that additional services or accommodations would have prompted respondent to participate in the services offered by DHHS, as she refused to participate in *any* services except for scheduled visits with the child, consistently maintaining that none of services applied to her and that she would not participate in any services because she "wanted her name cleared" and "want[ed] to be vindicated." Again, even though it was explained to her that the psychological and psychiatric evaluations could prove whether the prior diagnoses were erroneous, respondent still refused to participate and, therefore, precluded DHHS and the court from receiving information relevant to whether she needed additional services or accommodations. She also refused to listen to advice provided by the child's doctor and was resistant to parenting suggestions from foster care workers, which belies respondent's suggestion on appeal that additional services or accommodations would have made any difference in this case.

---

[6] We reject respondent's claims that, in order to ascertain *the nature* of respondent's disability or mental condition, DHHS should have further investigated the basis of her disability payments, independently questioned her doctors and the fathers of her other children, and independently investigated her medical records despite her refusal to sign any medical records releases. Respondent cites no authority holding that such an investigation was required, and it is clear that *In re Hicks/Brown* does not require that. See *In re Hicks/Brown*, ___ Mich App at ___; slip op at 16 (stating that if a parent has "*a known or suspected* intellectual, cognitive, or development impairment," "the DHHS must offer evaluations to determine the nature and extent of the parent's disability and to secure recommendations for tailoring necessary reunification services to the individual. The DHHS must then endeavor to locate agencies that can provide services geared toward assisting the parent to overcome obstacles to reunification."). But even if we assume, arguendo, that DHHS should have, and could have, pursued such extreme measures in this case, respondent has provided no suggestion on appeal of the information that would have been produced by such investigations. Instead, respondent herself calls the purported disability in this case "some barrier of an unknown name." Moreover, there is no indication that such an investigation was warranted given the evidence in this case.

Offering more or different services was neither a reasonable course of action nor required under DHHS's responsibility to make *reasonable* efforts. See MCL 712A.18f(1), (4); MCL 712A.19a(2); *In re Hicks/Brown*, ___ Mich App at ___; slip op at 6. "While the DH[H]S has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). When a respondent fails to adequately participate in, and benefit from, services that are, in fact, offered by petitioner, she is not entitled to claim that petitioner was required to provide additional services. See *id.*

Although respondent suggests on appeal that she appeared to have an inability, due to some psychological or medical reason, to "make the connection that refusal to comply with services would have direct consequences," such a conclusion is undermined by her clear and unequivocal statements on the record that she understood that her parental rights would be terminated if she failed to comply with the services offered by petitioner and ordered by the court. Unlike *In re Hicks/Brown*, there is no indication in the record that respondent had any cognitive limitations that prevented her from understanding these consequences. Instead, it appears that she simply believed, for her own reasons, that her decided course of action was preferable to the PAA ordered by the trial court.

We cannot conclude that the trial court's and DHHS's failure to provide additional services or accommodations constituted a plain error affecting respondent's substantial rights. See *In re Utrera*, 281 Mich App at 8-9.

## IV. AMERICAN INDIAN HERITAGE

Lastly, respondent contends that the trial court erred by failing to insist that DHHS investigate respondent's claim of possible American Indian heritage pursuant to the Indian Child Welfare Act ("ICWA"), 25 USC 1901 *et seq.*, and the Michigan Indian Family Preservation Act, MCL 712B.9. We disagree.

## A. STANDARD OF REVIEW

Generally, "[i]ssues involving the application and interpretation of [the] ICWA are questions of law that are reviewed de novo," and "[a] court's factual findings underlying the application of legal issues are reviewed for clear error." *In re Morris*, 491 Mich 81, 97; 815 NW2d 62 (2012). However, because respondent failed to preserve this issue our review is limited to plain error affecting her substantial rights. *In re Utrera*, 281 Mich App at 8-9.

## B. ANALYSIS

In *In re Morris*, 491 Mich at 102-109, the Michigan Supreme Court examined the ICWA's notice provision, 25 USC § 1912(a), and interpreted the requirement[7] that notice of certain involuntary child custody proceedings must be sent to the appropriate Indian tribe—or, if

---

[7] MCL 712B.9(1) includes a substantively similar notice requirement.

the identity or location of the tribe cannot be determined, the Secretary of the Interior—" 'where the court knows or has reason to know that an Indian child is involved . . . .' " *Morris*, 491 Mich at 88 (quoting 25 USC § 1912(a)). The Court explained, "The application of the requirements of 25 USC 1912(a) . . . is conditioned on whether the notice requirement is . . . triggered by indicia of Indian heritage sufficient to give the court actual knowledge or a 'reason to know' that the child at issue is an Indian child." *Id.* at 104. With regard to the specific nature of the knowledge or "reason to know" sufficient to trigger the notice requirement, the *Morris* Court adopted the "permissive standard" established by the Colorado Supreme Court and held that "sufficiently reliable information of virtually any criteria on which tribal membership might be based suffices to trigger the notice requirement of 25 USC § 1912(a)." *Id.* at 108. See also *id.* at 88-89. In doing so, it quoted the Bureau of Indian Affairs guidelines, which set forth nonexclusive "[c]ircumstances under which a state court has *reason to believe* a child involved in a child custody proceeding is an Indian [child]":

> (i) Any party to the case, Indian tribe Indian organization or public or private agency informs the court that the child is an Indian child.

> (ii) Any public or state-licensed agency involved in child protection services or family support has discovered information which suggests that the child is an Indian child.

> (iii) The child who is subject of the proceeding gives the court reason to believe he or she is an Indian child.

> (iv) The residence or the domicile of the child, his or her biological parents, or the Indian custodian is known by the court to be or is shown to be a predominantly Indian community.

> (v) An officer of the court involved in the proceeding has knowledge that the child may be an Indian child. [*Id.* at 105 (emphasis omitted).]

It also noted the following "nonexhaustive list of indicia sufficient to trigger tribal notice":

> situations in which (1) the trial court has information suggesting that the child, a parent of the child, or members of a parent's family are tribal members, (2) the trial court has information indicating that the child has Indian heritage, even though no particular Indian tribe can be identified, (3) the child's birth certificate or other official record indicates that the child or a parent of the child is of Indian descent, (4) the child, the child's parents, or the child's Indian custodian resides or is domiciled in a predominantly Indian community and (5) the child or the child's family has received services or benefits from a tribe or the federal government that are available to Indians. [*Id.* at 108 n 18.]

Here, when the trial court asked respondent at the preliminary hearing whether she had any Native American heritage, respondent replied, "I'm not sure." The court then asked respondent what she meant when she said that she was not sure, and respondent answered, "I was told[,] but I don't know the full extent of it."

In considering the indicia delineated above, we conclude that respondent's statements did not constitute "sufficiently reliable information" that triggered the notice requirements of the ICWA. Her answer was very vague and provided no basis for concluding that respondent herself had any *reliable* information that she had Indian heritage, especially given the fact that she did not indicate what exactly she "was told," who made the statement to her, or how Native American ancestry may run in her bloodline. Compare, for example, *In re Johnson*, 305 Mich App 328, 330, 332-334; 852 NW2d 224 (2014) (holding that conditional reversal was warranted when the minor child's father stated that both of his grandmothers were Native American). Accordingly, we cannot conclude that the trial court plainly erred in failing to insist that the DHHS investigate respondent's potential American Indian heritage. See *In re Utrera*, 281 Mich App at 8-9.

## V. CONCLUSION

Respondent has failed to establish that any of her claims on appeal warrant relief.

Affirmed.

/s/ Michael F. Gadola
/s/ Karen M. Fort Hood
/s/ Michael J. Riordan